We have five cases on our calendar this morning, four patent cases, two from District Court, two from the Pete tab, and a veteran's case which is being submitted on the briefs and will therefore not be argued. Our first case is Columbia Sportswear v. Seirus Innovative Accessories, 2018-13-29. Mr. Aldrich. Aldrich? Aldrich. Judge Lorry, Judge Moore, Judge Stoll, and my name is Nika Aldrich. I represent Columbia Sportswear. There are two critical and distinct sets of issues in this appeal. Columbia's appeal focuses on the utility patent and the District Court's improper transfer of venue. Seirus' appeal focuses on the design patent. I intend to rest on my papers with respect to most of the issues concerning the utility patent. I'll focus here solely on the new trial issue and will save the remainder of my time to discuss the important matters of first impression raised with respect to the design patent. The patent here claims a 30-70% coverage of heat directing elements over the inside of a garment. After a nine-day trial, a jury was asked to consider whether a patent was anticipated by or obvious in light of prior art that disclosed no more than 5-40% coverage and taught away from any additional coverage. That is a quintessential overlapping range, which this Court has addressed in numerous cases and is a somewhat specialized area of this Court's jurisprudence. The District Court chose not to give Columbia's Instruction No. 33 to properly inform the jury how it was to consider the issue of overlapping ranges. Seirus has identified no flaw in that instruction. Instead, the jury was given only a single instruction on the law of overlapping ranges. That was an erroneous explication of the law provided by Seirus's expert from the witness stand. But when you have overlapping ranges, there's sort of a presumption of obviousness unless there's criticality shown, right? That's correct. There's a presumption of obvious, which can be rebutted by a showing of criticality, and there was numerous, numerous evidence in the case about criticality. This was a nine-day jury trial that really only had two issues. It had the validity of this patent and it had damages on the other patent. There were days of testimony on criticality. Instead, as I said, the jury was given only a single instruction, and that was an erroneous instruction, an erroneous explication of the law by Seirus's expert. That same expert put false information before the jury testifying that Fottinger disclosed a single embodiment with 36% coverage. Thus, the jury was not appropriately instructed on the critical issue of how to address overlapping ranges. But more importantly, the jury's verdict was tainted by the false evidence submitted by Seirus. Seirus said at that hearing that Dr. Block, the demonstrative that they were seeking to enter into evidence and the testimony that would support it, would not exceed his expert report. That's what they expressly told the court. Now, I think the testimony with the 36% actually did exceed his expert report for sure, but you didn't subsequently object. You said nothing. You cross-examined him. You did not do the most brilliant job either, despite how outrageous the mistakes were, but you didn't object thereafter. We objected to the entire line of questioning. You objected in advance of the questions, not to the line of questioning. You objected, and they represented to the court that he would not testify beyond the scope of the expert report. He clearly did, and the court said, okay, well, if he's not going to go beyond the report, I'm going to let it in. He then clearly did, during the trial, go beyond the report, but you didn't object. It's your obligation at that point to object and preserve it for appeal. You didn't. Respectfully, I disagree. I think when we objected. Pardon? You disagree with the facts? You did object? No, no, I disagree that we had an obligation to object after the testimony was provided, when we objected clearly before the testimony was provided. You didn't know what the testimony was going to be. You objected to the demonstrative. Well, we objected to all testimony. And associated technology, and the court said, well, what's this associated testimony going to be? And they said, he will not exceed his expert report. And the court said, okay, then go ahead. So the court was of the belief he was not going to exceed the expert report. The court doesn't. I mean, come on. Do you think the district court is going to have read all these expert reports and listened question by question to see if he exceeds the scope of it? That's not the court's role. It's your role to object when they actually do what they told the court they're not going to do. It's not the district court judge's job to figure out question by question whether they've exceeded his attention. And now you're complaining about it. So I mean, I'm sorry, but look, I think what he did was wrong. I find it repulsive. I read the whole transcript. I think he exceeded his expert report. And I think it was nonsense. And I don't know how you didn't absolutely nail him to a cross. Maybe that was a bad example, but nail him to something on cross examination. He was belligerent. I don't know why the jury could have liked him based on what I read, but they did. And you didn't object. So there we have it. They were asked in advance of the testimony, are you going to put on an additional number? And they said, well, he's going to provide math that any high schooler could do. And we objected on that basis. I don't think we had a duty to, after the testimony was provided, go back and object again. At that point, it would be a motion to strike. I mean, the question's already, the information has already been given to the court. And so I think that the objection that we raised before the that waiver has ever been raised by Cirrus with respect to the timing of our objection, I think that our objection was preserved by objecting to the slide and any testimony related to the slide. And that was clearly testimony related to the slide, which was false, which did not satisfy the standards, which Columbia never had a chance to challenge his opinions before they were provided. And it was an issue that went to the heart of both anticipation and obviousness. Against that background, we would offer that I'll rest unless there are further questions on my opening appeal. We'll save the rest of your time for you. Thank you kindly. Mr. Sproul. Your Honors. May it please the Court. Seth Sproul on behalf of Cirrus. I'd like to regarding the coverage ratio of the example in Fottinger's. Do you disagree that Dr. Block exceeded his expert report when he testified that the specific example in Fottinger disclosed 36 percent, which would be square within, squarely within the range as a matter of concrete and specific example? Dr. Block's expert report did not recite 36 percent. What we were relying on was the fact. So the answer would be yes. The answer, Your Honor, is yes. Dr. Block's report did not contain that 36 percent. And so what we were offering to the Court was when we said, this is high school math, I refer the Court to page 22. But not only that, the 36 percent was wrong, right? As a matter of fact, it's not accurate. No, the 36 percent as Dr. Block offered it was correct. His math was correct for the area that he offered. And this is an important distinction and why, among many other reasons, this testimony was not false. This is not false. We take umbrage with that characterization. The record doesn't support it. If you look at page 22, where you can see the picture of the area presented by Dr. Block, you see what we offered was a very simple square with four circles on it. But it was 36 percent of the diagram he drew. It wasn't 36 percent of the example in Fottinger, correct? No. It was his representation of the example from Fottinger. And I will get to the distinction and the difference between what they crossed him with and what their view. You are arguing anticipation based on Fottinger? Yes. So he draws a picture, which is not from Fottinger. He then says, my picture shows 36 percent. Therefore, there's anticipation. Your Honor, it was from Fottinger. And if I may explain, if you look at page 22, there's a picture. It's the best way to see it. There's no dispute that this is an accurate representation of Fottinger's dots. And this is, you have four circles and one square. You can figure out the coverage ratio based on that. I'm sorry, page 22 of your red brief? 22 of our opening brief. 22 of your red brief? Of our red brief, yes, Your Honor. There's no picture on page 22. Excuse me. I'm sorry. 22 of Columbia's brief. My apologies. The blue brief. Four circles and a square. You can figure out the areas of the circle, figure out the area of the square. You can figure out the coverage percentage very easily based on that high school math. What Columbia was prepared to do and what they did was they crossed him on a different area of this. Columbia's theory was that that, as represented by Dr. Block, is accurate but does not represent what we would refer to as the unit cell, the repeatable unit over the entire surface of Fottinger's fabric that he created. And so, if you turn to page 26, what you see is the diagram that Columbia crossed Dr. Block with. This picture, which uses the dimensions that Dr. Block drew based on Fottinger's description but is a smaller area. Dr. Columbia. Look, 30 to 70 percent is not the same as 5 to 40, right? That's right, Your Honor. So, it doesn't sound like anticipation to me. But isn't your best argument that there's a presumption of obviousness and no showing of criticality? Certainly, Your Honor. That is a very strong argument here, especially where there was no showing of criticality. And I think we have substantial evidence in the record to show that, in fact, this claimed range was not critical. Why don't you address the cross appeal? Farewell, Your Honor. There are three primary issues in our cross appeal. I'd like to start with the summary judgment. The district court erred in at least four ways by granting summary judgment against Searis in this case. First, the court found that the Searis logo appearing in the heat wave design. Your view, presumably, is that the fabric, the design is on the fabric, not the product. That's right, Your Honor. That's an issue in the article of manufacture, and we offered significant evidence. But that goes to the heart of determination of damages. Yes, Your Honor. But I can move to that. We were the first district court to address the article of manufacture after the Supreme Court came down with its opinion in Samson v. Apple. And the court, the district court here largely adopted the recommended jury instructions from the Department of Justice with minor modifications. And that's because the parties, and the parties don't appeal that, right? Do the parties agree that that's the proper test, or is it simply a matter of this is how the jury was instructed and we're not challenging it? I don't believe it's challenged here on appeal. It was down below in various aspects. Except that we do challenge the burden shift that the district court imposed on Searis. And that is the primary basis for our appeal here. Two other district courts, to my knowledge, have also addressed this same issue under Samson v. Apple. Judge Lucico in the Northern District of California on remand, and a judge in Eastern District of Wisconsin. But there really is no law on the issue. The SG's views are not law, right? That's right. However, Your Honor. So we can decide this based on what appears before us, right? You've got a design which is on a number of products. And it seems rather strange, then, to say the design is the product. Which product? Yes, Your Honor. So that would support your view that the design is distinct from the product. And damages should be determined based on the value of the design, rather than the multiplicity of products. That's correct. Under this, certainly under the facts of this case, we have a multi-component product that's accused of infringement. Under Samson v. Apple, you can go through these- Multi-component or multiple products? Both, in fact. There's a large amount of variety amongst the various accused products. The court, in its summary judgment opinion, finding infringement didn't identify which products infringed. It simply referred to the fact- I don't understand. Because in some products, if I understand it right, the heat wave will be vertical. In other products, it'll be horizontal. Well, certainly, if it's horizontal, it's starting to look more like Columbia's design than vertical. Why wouldn't there be a parsing for both infringement and, potentially, for damages, for article of manufacture, between the different products? Like, let me give you an example. You have some gloves where the lining is sort of integral with the glove, and that's where it is. But then you have others where the lining is both on the exterior- the images, the design, are both on the exterior and the interior. Those seem like- It seems to me like fact-finders could reach different impressions for both infringement and then, ultimately, for damages. What is the article based on? What are meaningful differences between the various accused embodiments in this case? Absolutely, Your Honor. And that is one of the errors committed by the district court judge here, is he took that away from the jury. But what about damages? Do you think damages should be decided by a jury or by the court? I mean, not damages, but what the article of manufacture is. Certainly, here, I think the balance of case law suggests that the determination of the article of manufacture, certainly, is an issue that should go to the jury. It's part of the damages. Determination damages are- What case law says that? Typically legal. Are you just talking about the idea that damages are generally a question of fact that go to the jury? Generally, yes, Your Honor. And here, nothing suggests that we should treat this any differently. I'd refer the court to Nike v. Walmart, which had a slightly different context. But there, the court went through a sort of exhaustive analysis of whether or not Section 289, discouragement of profits under Section 289, was properly considered damages or something other than that in terms of the marking statute. And the court found, based on an Eighth Circuit survey of old case law, that, in fact, profits under Section 289 were damages, and damages typically go to the jury. So, can I ask you, I understand your appeal on damages to be largely a constitutional argument, you know, a dispute between the parties about whether this should go to the jury or not, which is really a question of Seventh Amendment of the Constitution. Is that fair? Yes, Your Honor. Okay, so if I were to agree with you that I think that summary judgment of infringement were improper because there are a lot of different accused products which manifest the design in a lot of different ways, and arguably some could result in infringement and some might not, and that should go to a jury, then there's no, we would affirmatively should not reach damages, right? Because constitutional avoidance says if you don't have to reach a constitutional issue, you shouldn't. And so if I were to agree with you on summary judgment and say, that shouldn't have been a matter of summary judgment on infringement, it should have gone to a jury, then we shouldn't be touching that damages issue. Is that correct? I think there are reasons why it would be prudent to do so here, Your Honor. Do you know what the Doctrine of Constitutional Avoidance says? I do understand. What does that doctrine say? What does the Supreme Court consistently, in over 50 cases, said about the Doctrine of Constitutional Avoidance? I have a general understanding that one shouldn't reach issues that aren't before it or aren't necessary for its determination. The Doctrine of Constitutional Avoidance one shouldn't generally reach issues that aren't necessary for their avoidance. That's a general matter of jurisprudence, judicial restraint, generally. Constitutional avoidance says if there's any way to decide the case other than the constitutional issues, Supreme Court says you should choose that way. Because you should always, constitutional issues are just so important and so profound. And it guarantees the Supreme Court has to take the case, which I'm sure you would love, because maybe you haven't argued in front of the Supreme Court. So that would be fun. I could see why you might enjoy that. But that's why they say to the appellate courts, don't do it. If there's any way to decide a case that does not necessitate resolving the constitutional issue, you should do that. Don't force us to take cases. So because your damages question for us includes the question of whether this issue should be decided by a judge or jury, I mean, does it include that? Do we have to address that issue in order to be able to provide advice on damages in this case? No, Your Honor, I don't believe so. I think the court can address a smaller question that would actually be beneficial for other courts who are going to have to go through the same process again. And even the parties before you now, we will go back on remand, ideally, if you were to overturn the summary judgment, and then potentially come back up on this very same issue that's now before you. What is that smaller question? And that is, who gets to decide and how you decide the article of manufacture? Where does the burden lie? I'm sorry, I misspoke, and I didn't mean to address it in that form. Whether the burden should rest, sorry, I shouldn't have said who gets to decide. Whether the burden should rest with the plaintiff in the first instance, the ultimate question, whether that should rest with the plaintiff or whether that should be shifted to the defendant, as the judge did here. And we think that question is not a jurisdictional question that touches the Seventh Amendment issue. That issue, you can decide, and I think is properly before you. And what else? Is there anything else, or is it just that issue? I mean, because the other questions that have to be grappled with at some point are, what is the test? Who decides what the article of manufacture is? We've already talked about the doctrine of constitutional avoidance on that one. But you haven't, there's no challenge to the test. So what's, is there anything else? Yes, Your Honor. Well, I take that back. Here, the parties are not disputing the jury instructions. And so I don't believe that that issue is necessarily before you, except to the extent of the question of the burden shift. And at least as far as whether or not this is an acceptable jury instruction, I think the fact that the parties have agreed to it, multiple courts, district courts have now adopted it. It is not insignificant. Counsel, you wanted to save a little time to reply on your cross-appeal. Yes, Your Honor. We'll give you two minutes response time on your cross-appeal. Thank you. Goldberg. Thank you, Your Honor. Judge Meyer, I wanted to just briefly address the waiver issue that Your Honor addressed in my opening remarks. And Dr. Block had the slide in front of him, and he was asked to describe the slide. And in his three-paragraph answer at the bottom of it, he said, and that gives us 36% coverage. So there was no specific question that I could have objected to, because he wasn't asked, what is the percent coverage, which would give me the opportunity to object. You're saying that if an expert dramatically exceeds his expert report, even if not somehow in response to a question, that you can't stand up and say, objection, Your Honor. We ask that that be stricken, because the expert has exceeded his expert report. That's not something you could do? I mean, objection has to come before the answer. So at that point, I believe it's a motion to strike. Sometimes, right, okay, right. I think it should be stricken, yeah. And so if the concern is that we didn't move to strike after the false testimony was provided that exceeds... Or ask for a curative instruction, or ask for any other type of remedy from... Again, I think we preserved our objection to the entire line of questioning. And what we heard just now, actually, is, well, the math was actually right, but the demonstrative was completely wrong. It didn't show a unit cell. In which case, our objection was... Anyway, that's not what he said. Don't mischaracterize what the opposing counsel says. He did not stand up and say, our demonstrative was completely wrong. It didn't show a unit cell. He said, that's what you disputed. That it showed a unit cell. Don't overstate. I apologize. So just with that, I wanted to move on to the issue of the design patent. And I'm not sure... Sounds like the panel has a number of questions on process with respect to the design patent. To answer one of the questions, we did object to this particular jury instruction, but we are not raising that issue on appeal. One of the points that we thought was important is that the more than 100-year-old doctrine that's now referred to as the entire market value rule is perfectly applicable in the design patent context, which is... And the court and Congress have been clear that when you're looking at a design patent, you're not supposed to apportion the design from the functionality of whatever it's applied to, right? The Dobson case and then the statute revision that came after the Dobson cases from the U.S. Supreme Court made expressly clear that the entire purpose of Section 289 is to avoid having the design itself and the value of the design be the value that's dealt with in the context of design patent damages. Instead, whatever the design is applied to, you figure out the damages from that. And here, their argument is that the design was simply applied to a fabric. Well, the issue is that that fabric is the name of the product, right? The heat wave product is a heat wave design with wavy lines in the design. And then all of their logos and all of their marketing materials all emphasize heat wave, that fabric that is the distinguishing element. All of their marketing materials drive consumer demand for their products based on the functionality of that fabric. So our argument to the jury on closing argument was, look, these are single component products, and you're well within your rights to find that they're single component products, and that's the end of it. But if you find that they're multi-component products, we believe that the article of manufacture to which the design is applied are the... I mean, obviously, on the ones that are made 100% from heat wave fabric, that's the article of manufacture. But even on the gloves, the article of manufacture is the glove as a whole, and there's substantial evidence to support that. But even if you don't go there, even if you find that the fabric itself is the article of manufacture, we said that the profits that are earned on the gloves are the profits for that article, for that fabric, because that fabric is the distinguishing element. It is the sole source of consumer demand for those products. It is the source of their marketing. But without that design, the product may still have useful value. Without that fabric? Without that particular fabric. So I want to distinguish the... Without the fabric with that design. Without the fabric that has the design. I mean, if they replace that fabric with some other fabric, they can sell gloves, and in fact, they did. But, and they've pointed this out, there are gloves that they sold that don't have it, and then there are gloves that they sold that did have it. Because the glove is an object of utility. Absolutely. Keeps hands warm. That's correct. Irrespective of the design, the wavy design. And the material is a product of utility, irrespective of the design. The fabric itself is a... The fabric itself. Yeah, the fabric itself is a utilitarian product, that's correct. And so if they... But you just stressed that what they did in their advertising campaign, the reason people buy this is the heat wave product, the insulating product, the fabric. That's the utility of the product. What you didn't suggest to us is the reason people buy this is because it's got cool wavy lines on it. Because you can't claim anything useful in the design patent, you can only claim the appearance of it. And so what you have not suggested to us at all is that there are evidence that consumers wanted to purchase this or that they sold it based on the pretty design as opposed to the useful fabric. Yes, correct. But I don't think that that's the obligation. The obligation is to show what the damages, what the profits were for the article of manufacture to which it was applied. So the question now, though, is what is the article of manufacture? That's the first part of the damages inquiry, right? That's correct. Which doesn't really have anything to do with the entire market value rule. That's correct, too. I mean, well, at least as it was framed to the jury, it doesn't have anything to do with that. But our third argument was, if you should find that the article of manufacture is the fabric itself, the profits that they've earned for the fabric, if you have to figure out what the profits are that they've earned on the fabric, it is frankly the profits that they've earned on the gloves because the fabric is what sells the gloves. That's not before us. And that's really purely hypothetical anyway, because nobody's challenged the test here, right? There's only a challenge to the jury's. There's a challenge to the jury's determination of damages, which is based on a determination that the article of manufacture is the glove itself, regardless of whether it comprises, you know, you can see the lining or not, for example, right? It's all of their entire products. That's what the jury's damages award was based on, was profits on their full products. The profits on the full product. Yeah, that was the jury's determination. So would you have, do you think this is a question for a jury or for the court? Which question? The question of what is the article of manufacture? We believe that it's appropriately a question for, we believe it goes with the ultimate question of damages, the ultimate question of profits, the calculation of profits. And so that should be determined by who? And because we believe... Is it a question for the court or for the jury? Right, we believe that both are questions for the court. So because... For the judge to decide. For the judge to decide, correct. So because the first question, or because the ultimate question, which is what are the profits, is a question for the court to decide, we believe that the subsidiary questions to that ultimate determination are also for the court to decide. How do you respond to the doctrine of constitutional avoidance point, which is that, you know, let's assume hypothetically that we make a determination that the district court erred by granting summary judgment of infringement, and we think it should be vacated. Then how do we address and provide advice on what, who should be deciding questions of damages in the design patent context? I mean, it's possible that the court doesn't get there. I don't have, I don't have an idea. If the court reverses on the issue of infringement, which we don't believe would be proper, I don't have a suggestion about how the court avoids the avoidance issue and gets to the question or instructs the courts about who's supposed to handle the issue going forward. We believe that the Hard Candy case provides exceptional guidance to that, and perhaps the lower courts will be persuaded by the rationale provided by the 11th Circuit in that case going forward. But maybe it's beyond the purview of this court in those circumstances. I don't know. Thank you, counsel. Thank you very kindly. Justice Paul has a couple of minutes in rebuttal and cross-appeal. Thank you, Your Honor. I'd like to very briefly address this entire market value rule question. First of all, it's unclear and it's likely that the entire market value rule doesn't apply here. The guidance from the Supreme Court and Samsung v. Apple sets out a separate allocation structure where you look at the article of manufacture, and then you determine the profits attributable to that article of manufacture. If it's less than the entire component, then you figure out some lesser profit. The standard for applying the entire market value rule is very, very high. Our integrations, 2018, you have to find that the patented feature was the sole driver. The evidence doesn't support that here. And it's the patented feature, which in this case is a design. So I guess what I don't understand is why does that mean if the design is placed on a useful component, people buy it because of the utility, not the design, why does that mean a design patentee gets to claim the entire product? It doesn't. That application makes no sense to me, but for. It's not but for the fabric. It's but for the design in the damages world, right? That's absolutely correct, Your Honor. And it doesn't make sense legally or under the circumstances here. There was significant testimony that there were many other factors that users or customers would consider. Can you return to infringement, though? Because I don't know that we reach any of that if we're with you on infringement. I'm sorry. Infringement. Can you turn to your position on infringement, your cross appeal on infringement? Yes, Your Honor. Very briefly, I think there were at least four grounds on which the district court erred. First ground was to ignore the logo. Relying primarily on the L.A. Gear case. And all of those cases were about labels that were affixed really more so than designs which incorporated logos throughout and repeatedly, right? That's exactly right. Here we have an integrated logo that's visually disruptive to the underlying wave pattern. Repeated throughout the entire fabric. Repeated. Within a square foot, there are 58 separate serious logos. This isn't like a little polo on your shirt, which is just one little thing right here. It's all throughout. No, that's exactly right, Your Honor. L.A. Gear dealt with a complex 3D shoe where there was an admitted copy of the shoe design. And on that admitted copy was placed a logo. And the court said, no, you don't get out of infringement, admitted infringement, just by placing a logo. But that is not what we have here where you have a relatively simple two-dimensional design interspersed with an ornamental logo. The test for determining infringement under design patent law is, would an ordinary observer find substantial similarity between the two designs? And what is the overall visual impression? And there's no question that at least the jury should have been able to decide whether or not that logo, that ornamental logo, repeated throughout the design was, in fact, or created some distinction, some dissimilarity in the overall visual impression. The court, in addition, also disregarded the wave thickness. Of course, aside from the logo, turn it 90 degrees, and it's the same, right? Well, that's not true. And it's a big step to get aside from the logo because to do that, you need to remove the logo. So you're saying the logo is it? I'm saying the logo is the most important. But orientation, one way I've had it presented to me was, there's a difference between prisoners and referees, right? And it's orientation. One's vertical, one's horizontal. We can't say it doesn't make a difference or if a referee's lying on his side, he's a prisoner. That doesn't make any sense. I'll have to think about that. We'll take the case under advisement. Thank you, Your Honors. I think your argument is concluded. I believe I'm done. Yes, I think so, too. Thank you, Your Honors.